SANFORD A. KASSEL (SBN 100681)
GAVIN P. KASSEL (SBN 284666)
*SANFORD A. KASSEL, A Professional Law Corporation*
Wells Fargo Bank Building, Suite 207
334 West Third Street
San Bernardino, CA 92401
Tel: (909) 884-6451
Fax: (909) 885-8032
office@skassellaw.com
gavin@skassellaw.com
sandy@skassellaw.com

Attorneys for Plaintiffs:
DAVID H. FEINBERG; LISA M. JACKSON;
and LAKISATHA D. KING,

# UNITED STATES DISTRICT COURT

## CENTERAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID H. FEINBERG; LISA M. JACKSON; and LAKISATHA D. KING | **CASE NO.** |
| | <u>**CLASS ACTION**</u> |
| Plaintiff, | **(1) Violation of the California Consumer Privacy Act § 1798.150** |
| v. | **(2) Declaratory Relief;** |
| T-MOBILE USA, INC. and Does 1 through 100, inclusive, and each of them, | **(3) Negligence** |
| | **(4) Unjust Enrichment** |
| Defendants. | **(5) Breach of Implied Contract** |
| | **(6) Violation of the California Consumer Legal Remedies Act** |
| | **(7) Violation of California Business & Professions Code section 17200, et seq.** |
| | **AND DEMAND FOR JURY TRIAL** |

PLAINTIFFS' COMPLAIINT

Plaintiffs DAVID H. FEINBERG, LISA M. JACKSON and LAKISATHA D. KING individually, and on behalf of all others similarly situated, bring this action against defendants T-MOBILE USA, INC. ("T-Mobile") and Does 1 through 100, inclusive, and each of them, and allege, on information and belief (except as to those allegations relating to plaintiffs, which are asserted on personal knowledge), as follows:

## INTRODUCTION

1.     This action is brought as a class action under the provisions of California Code of Civil Procedure section 382.

2.     PARTIES. Plaintiffs are residents of the State of California, County of Los Angeles, and San Bernardino and at all times were customers of Defendants and each of them.

3.     At all material times, Defendants T-MOBILE USA, INC. and Does 1 through 100, inclusive, and each of them, were corporations and/or other business entities form unknown conducting business in the State of California, County of Los Angeles.

4.     The true names and capacities, whether individual, corporate, associate, representative or otherwise, of the defendants identified herein as Does 1 through 100, inclusive, are unknown to Plaintiffs, who therefore sue these Defendants by said fictitious names. Plaintiffs will amend this complaint to allege the true names and capacities of Does 1 through 100 when they have been ascertained. Does 1 through 100 are in some manner legally responsible for the wrongs and injuries alleged herein.

5. Each defendant acted as the agent or employee of the others, and each acted within the scope of that agency or employment.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 class members, and one or more members of the classes are residents of a different state than the Defendant. The Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over Defendants because Defendant conducts business in the state of California, Defendants have physical stores located throughout California, and conducts business in California through its website.

8. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ and 22, as Defendant resides, transacts business, committed an illegal or tortious act, has an agent, and/or can be found in this District.

## STATEMENT OF FACTS

9. Defendants and each of them have admitted they are the subject of a yet another massive data breach that affected millions of its customers. The stolen customer personal identifying information ("PII") the hackers have sold and continue to market for sale is believed to include: customers' names, addresses, social security numbers, drivers' license information, phone numbers, dates of birth, security PINs, phone numbers, and, for some customers, unique IMSI and IMEI numbers (embedded in customer mobile devices that identify the device and the SIM

card that ties that customer's device to a telephone number)—all going back as far as the mid-1990s.

10.    According to the hackers, they were able to access the PII through an opening in T-Mobile's wireless data network that allowed access to two of T-Mobile's customer data centers. From there, they were able to access several customer databases totaling more than 100 gigabytes.

11.    Motherboard, the tech news division of Vice, has reported that it reviewed samples of the data and confirmed it contained accurate information about T-Mobile customers. The hackers also offered to verify that they possessed the customers' PII, stating: "If you want to verify that I have access to the data/the data is real, just give me a T-Mobile number and I'll run a lookup for you and return the IMEI and IMSI of the phone currently attached to the number and any other details," @und0xxed said. "All T-Mobile USA prepaid and postpaid customers are affected; Sprint and the other telecoms that T-Mobile owns are unaffected."

12.    As a result of the Data Breach and because the stolen data is being active marketed for sale, numerous entities are suggesting that affected consumers take steps to protect their identities.

13.    The Washington Post reported that affected individuals should: 1) Change your password and PIN; 2) freeze your credit; 3) rethink two-factor authentication; and 4) keep monitoring the situation.

14.    T-Mobile is no stranger to data breaches. Rather, data breaches have been a nearly annual event for the company for many years.

15.    The Washington Post reported that "[u]nfortunately, dealing with data breaches is nothing new for the company — or its customers. For those keeping

4

count, this is the fifth such incident the wireless carrier has suffered in the past three years, but according to Allie Mellen, a security and risk analyst at Forrester Research, this is 'the worst breach they've had so far.'"

16. In March 2020, T-Mobile disclosed it was subject to a data breach that exposed customer and employee PII, including names, addresses, social security numbers, financial account information, government identification numbers, phone numbers and billing account customer proprietary network information (CPNI) and undisclosed call-related information for hundreds of thousands of customers.

17. Later in 2020, T-Mobile suffered another data breach in which hackers accessed information.

18. In November 2019, hackers accessed PII for roughly 1 million T-Mobile Prepaid customers. The PII in that breach includes customer information, phone numbers, address and account information and rate, plan and calling features (i.e., paying for international calls).

19. In 2018, hackers gained access to T-Mobile servers and stole PII of roughly two million T-Mobile customers. T-Mobile downplayed the hack, claiming that no passwords were "compromised." In truth, the hackers stole millions of encrypted passwords that were likely cracked due to the weak encoding algorithm employed by T-Mobile, leading one security expert to advise affected customers to assume their passwords were cracked and to change them as a result.

20. In 2017, Karan Saini, a security researcher, found a bug on a T-Mobile website that allowed hackers to access PII like email addresses, account numbers,

and IMSI numbers, just by knowing or guessing a customer's phone number. According to Saini, "T-Mobile has 76 million customers, and an attacker could have ran a script to scrape the data (email, name, billing account number, IMSI number, other numbers under the same account which are usually family members) from all 76 million of these customers to create a searchable database with accurate and up-to-date information of all users." Saini explained "[t]hat would effectively be classified as a very critical data breach, making every T-Mobile cell phone owner a victim." T-Mobile had no mechanism in place to prevent this type of critical data breach, according to Saini. According to a hacker, the bug had been exploited by multiple hackers over a multi-week period before it was discovered by Saini. In fact, the hackers who found the bug before Saini went so far as to upload a tutorial on how to exploit it on YouTube.

21.   In 2015 T-Mobile's customer PII was accessed and exfiltrated in conjunction with the Experian data breach. According to T-Mobile at the time, the company was notified by Experian, a vendor that processes their credit applications, that they had experienced a data breach. The hacker acquired the records of approximately 15 million people, including new applicants requiring a credit check for service or device financing. The records stolen included information such as name, address, and birthdate as well as encrypted fields with Social Security number and ID number (such as driver's license or passport number), and additional information used in T-Mobile's own credit assessment. Experian determined that encryption may have been compromised.

22.   T-Mobile's Privacy Policy is available on its website and provides

PLAINTIFFS' COMPLAIINT

customers with terms and conditions regarding the treatment of their PII, including how T-Mobile uses customers' data for its own benefit and profit.

23.    For example, it states T-Mobile uses customers' personal data to "[a]dvertise and market products and services from T-Mobile and other companies to you, including through targeted advertising and communications about promotions and events, contents, and sweepstakes"; and "[c]onduct research and create reports from analysis of things like usage patterns and trends and deidentify or aggregate personal data to create business and market analysis and reports."

24.    The policy, dated May 5, 2021, also states: "[S]tarting on April 26, 2021, T- Mobile began "using some data we have about you, including information we learn from your web and device usage data (like the apps installed on your device) and interactions with our products and services, for our own and 3rd party advertising, unless you tell us not to."

25.    According to the policy's California privacy rights section, included for purposes of complying with the CCPA, in the past 12 months T-Mobile has sold to third parties "shared device identifiers and internet and electronic network activity to facilitate online advertising. This means that a unique, resettable number that identifies your device was linked to online activity and shared with others who use that data for advertising and analytics purposes (like advertising networks, data analytics providers, and social media platforms)."

26.    Based on the customer PII T-Mobile collects and sells, T-Mobile states that its customers "see T-Mobile and other advertisements on your devices - whether you are connected to our network or not. These ads may be targeted to your device

PLAINTIFFS' COMPLAIINT

based on information that we, the advertiser, and other third parties have about your behavior or interests ....."

27.    T-Mobile also "works with third parties, including advertising networks, which collect information about you through devices, websites, and apps, serve ads for us and others, and measure their effectiveness. ... For example, third parties like Google Ad Manager and Nielsen may use technology to collect data to deliver, personalize, and measure ads for some of our Products and Services. This technology allows tracking of device activity over time across online properties."

28.    In addition, T-Mobile partners "with analytic service providers like Google Analytics to help track your use of our products and services." "If your mobile device is turned on, our network is collecting data about where it is. We may use, provide access to, or disclose this network location data without your permission to provide and support our services."

29.    After listing all of these ways T-Mobile benefits and profits from tracking and targeting its customers through collecting and maintaining their invaluable PII, T-Mobile's Privacy Policy goes on to ensure its customers that their PII is secure, stating that (i) personal data will be disclosed only "with your consent, which we may get in writing, online, or orally," and (ii) T-Mobile uses "administrative, technical, contractual, and physical safeguards designed to protect your data while it is under our control." Yet again, those safeguards have failed.

30.    Plaintiff DAVID H. FEINBERG has been a customer of T-Mobile for approximately three years through the present and is a resident of Porter Ranch, California.

31. On approximately August 15, 2021, Mr. Feinberg became aware that that T- Mobile had suffered a massive data breach and customer PII was being sold by hackers. Since then, he has spent hours addressing the resulting privacy concerns, including researching the nature of the breach, and reviewing his financial and credit account statements for evidence of unauthorized activity, which he will continue to do for years into the future.

32. Plaintiff LISA M. JACKSON has been a customer of T-Mobile from approximately 2016 through the present and is a resident of San Bernardino, California.

33. On approximately August 19, 2021, Ms. Jackson became aware that that T- Mobile had suffered a massive data breach and customer PII was being sold by hackers. Since then, he has spent hours addressing the resulting privacy concerns, including researching the nature of the breach, and reviewing his financial and credit account statements for evidence of unauthorized activity, which she will continue to do for years into the future.

34. Plaintiff LAKISATHA D. KING has been a customer of T-Mobile from approximately January of 2017 through the present and is a resident of Victorville, California.

35. On approximately August 17, 2021, Ms. King became aware that that T- Mobile had suffered a massive data breach and customer PII was being sold by hackers. Since then, he has spent hours addressing the resulting privacy concerns, including researching the nature of the breach, and reviewing his financial and credit account statements for evidence of unauthorized activity, which she will continue to

do for years into the future.

36. T-Mobile was aware or should have been aware of its obligations to protect its customers' PII and privacy before and during the Data Breach yet failed to take reasonable steps to protect customers from unauthorized access.

37. Plaintiffs and Class members have suffered and will continue to suffer harm because of the Data Breach.

38. Plaintiffs and Class members face an imminent and substantial risk of injury of identity theft and related cyber-crimes due to the Data Breach. Once data is stolen, malicious actors will either exploit the data for profit themselves or sell the data on the dark web, as occurred here, to someone who intends to exploit the data for profit. Hackers would not incur the time and effort to steal PII and then risk prosecution by listing it for sale on the dark web if the PII was not valuable to malicious actors.

39. The dark web helps ensure users' privacy by effectively hiding server or IP details from the public. Users need special software to access the dark web. Most websites on the dark web are not directly accessible via traditional searches on common search engines and are therefore accessible only by users who know the addresses for those websites.

40. Malicious actors use PII to gain access to Class members' digital life, including bank accounts, social media, and credit card details. During that process, hackers can harvest other sensitive data from the victim's accounts, including personal information of family, friends, and colleagues.

41. Malicious actors can also use Class members' PII to open new financial

PLAINTIFFS' COMPLAIINT

accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities."

42.    The PII accessed in the Data Breach therefore has significant value to the hackers that have already sold or attempted to sell that information and may do so again. In fact, names, mailing and email addresses, dates of birth, phone numbers, account information, social security numbers, phone identification numbers, and drivers' license numbers are among the most valuable pieces of information for hackers.

43.    As established above, the PII accessed in the Data Breach is also very valuable to T-Mobile. T-Mobile collects, retains, and uses this information to increase profits through predictive and other targeted marketing campaigns. T-Mobile customers value the privacy of this information and expect T-Mobile to allocate enough resources to ensure it is adequately protected. Customers would not have done business with T-Mobile, provided their PII and payment card information, and/or paid the same prices for T-Mobile's goods and services had they known T-Mobile did not implement reasonable security measures to protect their PII. T-Mobile boasts that it is the second largest wireless carrier in the country. Customers expect that the payments they make to the carrier, either prepaid or each month, incorporate the costs to implement reasonable security measures to protect customers' personal information.

44.    The PII accessed in the Data Breach is also very valuable to Plaintiffs and Class members. Consumers often exchange personal information for goods and

services. For example, consumers often exchange their personal information for access to Wi-Fi in places like airports and coffee shops. Likewise, consumers often trade their names and email addresses for special discounts (e.g., sign-up coupons exchanged for email addresses). Consumers use their unique and valuable PII to access the financial sector, including when obtaining a mortgage, credit card, or business loan. As a result of the Data Breach, Plaintiffs and Class members' PII has been compromised and lost significant value.

45.     Plaintiffs and Class members will face a risk of injury due to the Data Breach for years to come. Malicious actors often wait months or years to use the personal information obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen personal information, meaning individuals can be the victim of several cyber-crimes stemming from a single data breach. Finally, there is often significant lag time between when a person suffers harm due to theft of their PII and when they discover the harm. For example, victims rarely know that certain accounts have been opened in their name until contacted by collections agencies. Plaintiffs and Class members will therefore need to continuously monitor their accounts for years to ensure their PII obtained in the Data Breach is not used to harm them.

46.     Even when reimbursed for money stolen due to a data breach, consumers are not made whole because the reimbursement fails to compensate for the significant time and money required to repair the impact of the fraud. On average, victims of identity theft spend 7 hours fixing issues caused by the identity theft. In

some instances, victims spend more than 1,000 hours trying to fix these issues.

47.     Victims of identity theft also experience harm beyond economic effects. According to a 2018 study by the Identity Theft Resource Center, 32% of identity theft

victims experienced negative effects at work (either with their boss or coworkers) and 8% experienced negative effects at school (either with school officials or other students).

48.     The U.S. Government Accountability Office likewise determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."

49.     Plaintiffs and Class Member customers have failed to receive the value of the T- Mobile services for which they paid and/or would have paid less had they known that T- Mobile was failing to use reasonable security measures to secure their data.

50.     T-Mobile requires its customers to provide a significant amount of highly personal and confidential PII to purchase its good and services. Defendant collects, stores, and uses this data to maximize profits while failing to encrypt or protect it properly.

51.     T-Mobile has legal duties to protect its customers' PII by implementing reasonable security features. This duty is further defined by federal and state guidelines and industry norms.

52.     Defendants and each of them breached their duties by failing to

implement reasonable safeguards to ensure Plaintiffs' and Class members' PII was adequately protected. As a direct and proximate result of this breach of duty, the Data Breach occurred, and Plaintiffs and Class members were harmed. Plaintiffs and Class members did not consent to having their PII disclosed to any third-party, much less a malicious hacker who would sell it to criminals on the dark web.

53.    The Data Breach was a reasonably foreseeable consequence of Defendants' inadequate security systems. T-Mobile, which made approximately $70 billion in revenue in 2020, certainly has the resources to implement reasonable security systems to prevent or limit damage from data breaches. And after almost yearly data breaches for the past 5 years, it knew

that its systems were utterly lacking. Even so, it failed to properly invest in its data security. Had T-Mobile implemented reasonable data security systems and procedures (i.e., followed guidelines from industry experts and state and federal governments), then it likely could have prevented hackers from infiltrating its systems and accessing its customers' PII.

54.    T-Mobile's failure to implement reasonable security systems has caused Plaintiffs and Class members to suffer and continue to suffer harm that adversely impact Plaintiffs and Class members economically, emotionally, and/or socially. As discussed above, Plaintiffs and Class members now face a substantial, imminent, and ongoing threat of identity theft, scams, and resulting harm. These individuals now must spend significant time and money to continuously monitor their accounts and credit scores and diligently sift out phishing communications to limit potential adverse effects of the Data Breach regardless of whether any Class

member ultimately falls victim to identity theft.

55. In sum, Plaintiffs and Class members were injured as follows: (i) theft of their PII and the resulting loss of privacy rights in that information; (ii) improper disclosure of their PII; (iii) the lost value of unauthorized access to their PII; (iv) diminution in value of their PII; (v) the certain, imminent, and ongoing threat of fraud and identity theft, including the economic and non-economic impacts that flow therefrom; (vi) ascertainable out-of-pocket expenses and the value of their time allocated to fixing or mitigating the effects of the Data Breach; (vii) overpayments to T-Mobile for goods and services purchased, as Plaintiffs and Class members reasonably believed a portion of the sale price would fund reasonable security measures that would protect their PII, which was not the case; and/or (viii) nominal damages.

56. Even though T-Mobile has decided to offer free credit monitoring for two years to its affected customers, this is insufficient to protect Plaintiffs and Class members. As discussed above, the threat of identity theft and fraud from the Data Breach will extend for many years and cost Plaintiffs and the Classes significant time and effort. Accordingly, this action represents the enforcement of an important right affecting the public interest and will confer a significant benefit on the general public or a large class of persons.

57. Plaintiffs and Class members therefore have a significant and cognizable interest in obtaining injunctive and equitable relief (in addition to any monetary damages) that protects them from these long-term threats.

///

PLAINTIFFS' COMPLAIINT

## CLASS ACTION ALLEGATIONS

58.    Plaintiffs bring this action on their own behalf and on behalf of all similarly situated customers of defendants and each of them. Such a representative action is necessary to prevent and remedy the unlawful conduct alleged herein.

59.    The members of the class are so numerous that joinder of all members is impracticable.

60.    There is a well-defined community of interest among the members of the proposed class. The factual bases of defendant's misconduct are common to all members of the class and represent a common practice of wrongful conduct resulting in damages to all members of the class.

61.    There are numerous questions of law and fact common to plaintiffs and the members of the class and those questions predominate over any questions that may affect individual members of the class.

62.    Plaintiffs will fairly and adequately represent and protect the interests of the class. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and have the financial resources necessary to do so. Neither plaintiffs nor their counsel have any interest adverse to those of the class.

63.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the class is impracticable. Further, the expense and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them. The cost to the court system of such individual adjudication would be substantial. Individualized litigation would also present the potential for

PLAINTIFFS' COMPLAIINT

inconsistent or contradictory judgments and would magnify the delay and expense to all parties and the court system in multiple trials of identical factual issues. By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each class member.

64.     Plaintiffs and the class members are entitled to an award of attorney's fees incurred in connection with enforcing their rights.

65.     The class includes (1) all U.S. residents whose data was exfiltrated in the Data Breach, and (2) all California residents whose data was exfiltrated in the Data Breach. Specifically excluded from the Classes are Defendant; its officers, directors, or employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of Defendant. Also excluded from the Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

66.     The members of the Classes are readily identifiable and ascertainable. Defendants and/or their affiliates, among others, possess the information to identify and contact class members.

67.     The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of class members is unknown to Plaintiffs at this time, based on information and belief, the Nationwide Class consists of between 50 and 100 million customers whose data was compromised in the Data Breach, and the California Class consists of millions of customers whose data was

PLAINTIFFS' COMPLAIINT

compromised in the Data Breach.

68.    Plaintiffs' claims are typical of the claims of the members of the classes because all class members had their PII accessed, exfiltrated, and stolen in the Data Breach and were harmed as a result.

69.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have no interest antagonistic to those of the classes and are aligned with Class members' interests because Plaintiffs were subject to the same Data Breach as Class members and faces similar threats due to the Data Breach as Class members. Further, plaintiffs' counsel has ligated several classes and PAGA representative actions including but not limited to *Ahamdie v Lowes* Case no. CIVDS1706290, *Illman v Browning Automotive Group* Case No. CIVDS1517002, and *Rodriguez v. Walmart* Case No. MCC1700530.

70.    There are questions of law and fact common to the classes. These common questions predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

    a. Whether Defendant violated § 1798.150 of the CCPA;

    b. Whether Defendant owed Plaintiffs and class members a duty to implement and maintain reasonable security procedures and practices to protect their personal information;

    c. Whether Defendant breached an implied contract with Plaintiffs and class members, including but not limited to whether Defendant breached an implied agreement with Plaintiffs and class members to keep their PII confidential;

    d. Whether Defendant received a benefit without proper restitution making it unjust for Defendant to retain the benefit without commensurate compensation;

PLAINTIFFS' COMPLAIINT

e. Whether Defendant acted negligently in connection with the monitoring and/or protection of Plaintiffs' and class members' PII;

f. Whether Defendant breached its duty to implement reasonable security systems to protect Plaintiffs' and class members' PII;

g. Whether Defendant's breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiffs and class members;

h. Whether Defendant adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

i.  When Defendant learned of the Data Breach and whether its response was adequate;

j.  Whether Plaintiffs and other class members are entitled to credit monitoring and other injunctive relief;

k. Whether Defendant provided timely notice of the Data Breach to Plaintiffs and class members; and,

l. Whether class members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the Data Breach.

71.     Defendants and each of them have engaged in a common course of conduct and class members have been similarly impacted by Defendants' failure to maintain reasonable security procedures and practices to protect customers' PII, as well as Defendant's failure to timely alert affected customers to the Data Breach.

72.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of

PLAINTIFFS' COMPLAIINT

law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all class members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and risk inconsistent treatment of claims arising from the same set of facts and occurrences.

## **PRE-LAWSUIT NOTICES**

73.    On August 19, 2021, plaintiffs, by and through their counsel, gave notice to defendants concerning their violations of the California Consumer Privacy Act by way of correspondence sent federal express, a true and correct copy of which is attached herewith as Exhibit A. Plaintiffs did not receive an express written response from T-Mobile within 30 days that the violations have been cured per California Civil Code § 1798.150(b).

## **FIRST CAUSE OF ACTION FOR VIOLATION OF**
## **THE CALIFORNIA CONSUMER PRIVACY ACT**

74.    Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

75.    Defendants and each of them are a corporation organized or operated for the profit or financial benefit of its owners with annual gross revenues over $70 billion. Defendants collect consumers' PII as defined in Cal. Civ. Code § 1798.140.

76.    Defendants violated § 1798.150 of the CCPA by failing to prevent Plaintiffs' and class members' nonencrypted PII from unauthorized access and exfiltration, theft, or disclosure as a result of Defendants' violations of its duty to

implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

77. Defendants have a duty to implement and maintain reasonable security procedures and practices to protect Plaintiffs' and class members' PII. As detailed herein, Defendants failed to do so. As a direct and proximate result of Defendants' acts, Plaintiffs', and class members' PII, including social security numbers, phone numbers, names, addresses, unique IMEI numbers, and drivers' license information, was subjected to unauthorized access and exfiltration, theft, or disclosure.

78. Plaintiffs and class members seek injunctive or other equitable relief to ensure Defendants hereinafter adequately safeguard customers' PII by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold customers' PII, including Plaintiffs' and class members' PII. Plaintiffs and class members have an interest in ensuring that their PII is reasonably protected, and Defendants have demonstrated a pattern of failing to adequately safeguard this information.

## SECOND CAUSE OF ACTION FOR DECLARATORY RELIEF

79. Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

80. As described herein, an actual controversy has arisen and now exists as to whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of the information to protect the personal information under the CCPA.

81. A judicial determination of this issue is necessary and appropriate at

this time under the circumstances to prevent further data breaches by Defendants and third parties with similar inadequate security measures.

## THIRD CAUSE OF ACTION FOR NEGLIGENCE

82.     Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

83.     Defendants and each of them breached their duty of care by failing to implement reasonable security procedures and practices to protect this PII. Among other things, Defendants failed to: (i) implement security systems and practices consistent with federal and state guidelines; (ii) implement security systems and practices consistent with industry norms; (iii) timely detect the Data Breach; and (iv) timely disclose the Data Breach to impacted customers.

84.     Defendants knew or should have known that Plaintiffs' and Class members' PII was highly sought after by cyber criminals and that Plaintiffs and class members would suffer significant harm if their PII was stolen by hackers.

85.     Defendants also knew or should have known that timely detection and disclosure of the Data Breach was required and necessary to allow Plaintiffs and class members to take appropriate actions to mitigate the resulting harm. These efforts include, but are not limited to, freezing accounts, changing passwords, monitoring credit scores/profiles for fraudulent charges, contacting financial institutions, and cancelling or monitoring government-issued IDs such as passports and driver's licenses.

86.     Defendants had a special relationship with Plaintiffs and Class members who entrusted Defendants with several pieces of PII. Defendants'

customers were required to provide PII when purchasing or attempting to purchase Defendants' products and services. Plaintiffs and class members were led to believe Defendants would take reasonable precautions to protect their PII and would timely inform them if their PII was compromised, which Defendants failed to do.

87.     The harm that Plaintiffs and Class members suffered (and continue to suffer) was the reasonably foreseeable product of Defendants' breach of its duty of care. Defendants failed to enact reasonable security procedures and practices, and Plaintiffs and class members were the foreseeable victims of data theft that exploited the inadequate security measures. The PII accessed in the Data Breach is precisely the type of information that cyber criminals seek and use to commit cybercrimes.

88.     But-for Defendants' breach of their duty of care, the Data Breach would not have occurred and Plaintiffs' and class members' PII would not have been stolen and offered for sale by an unauthorized and malicious party.

89.     As a direct and proximate result of the Defendants' negligence, Plaintiffs and class members have been injured and are entitled to damages in an amount to be proven at trial. Such damages include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card

statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII; lost value of unauthorized access to their PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## **FOURTH CAUSE OF ACTION FOR UNJUST ENRICHMENT**

90.     Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

91.     Plaintiffs and class members have an interest, both equitable and legal, in the PII about them that was conferred upon, collected by, and maintained by Defendants and that was ultimately stolen in the Data Breach.

92.     Defendants were benefitted by the conferral upon it of the PII pertaining to Plaintiffs and class members and by its ability to retain, use, and profit from that information. Defendants understood that it was in fact so benefitted.

93.     Defendants also understood and appreciated that the PII pertaining to Plaintiffs and class members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

94.     But for Defendants' willingness and commitment to maintain its privacy and confidentiality, that PII would not have been transferred to and entrusted with Defendants.

95.     Defendants continue to benefit and profit from its retention and use of the PII while its value to Plaintiffs and class members has been diminished.

96.     Defendants also benefitted through their unjust conduct by selling their services for more than those services were worth to Plaintiffs and class members,

who would not have applied for or used T-Mobile service plans at all, or at the terms offered by T-Mobile, had they been aware that Defendants would fail to protect their PII.

97. Defendants also benefitted through their unjust conduct by retaining money that they should have used to provide reasonable and adequate data security to protect Plaintiffs' and class members' PII.

98. It is inequitable for Defendants to retain these benefits.

99. As a result of Defendants' wrongful conduct as alleged in this Complaint (including, among things, their knowing failure to employ adequate data security measures, their continued maintenance and use of the PII belonging to Plaintiffs and class members without having adequate data security measures, and their other conduct facilitating the theft of that PII), Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and class members.

100. Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and class members' PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

101. Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they received, and are still receiving, without justification, from Plaintiffs and class members in an unfair and unconscionable manner. Defendants' retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

102. The benefits conferred upon, received, and enjoyed by Defendants were not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendants to retain these benefits.

103. Plaintiffs have no adequate remedy at law.

104. Defendants are therefore liable to Plaintiffs and class members for restitution or disgorgement in the amount of the benefit conferred on Defendants as a result of its wrongful conduct, including specifically: the value to Defendants of the PII that was stolen in the Data Breach; the profits Defendants are receiving from the use of that information; the amounts that T- Mobile overcharged Plaintiffs and class members for use of its services; and the amounts that Defendants should have spent to provide reasonable and adequate data security to protect Plaintiffs' and class members' PII.

**FIFTH CAUSE OF ACTION FOR BREACH OF IMPLIED CONTRACT**

105. Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

106. Plaintiffs and class members entered into an implied contract with T-Mobile when they sought or obtained services from T-Mobile, or otherwise provided PII to T-Mobile.

107. As part of these transactions, T-Mobile agreed to safeguard and protect the PII of Plaintiffs and class members, and in the alternative, nominal damages.

108. Plaintiffs and class members entered into implied contracts with the reasonable expectation that T-Mobile's data security practices and policies were reasonable and consistent with industry standards. Plaintiffs and class members

PLAINTIFFS' COMPLAIINT

believed that T-Mobile would use part of the monies paid to T-Mobile under the implied contracts to fund adequate and reasonable data security practices.

109. Plaintiffs and class members would not have provided and entrusted their PII to T-Mobile or would have paid less for T-Mobile's services in the absence of the implied contract or implied terms between them and T-Mobile. The safeguarding of the PII of Plaintiffs and class members was critical to realize the intent of the parties.

110. Plaintiffs and class members fully performed their obligations under the implied contracts with T-Mobile.

111. T-Mobile breached its implied contracts with Plaintiffs and class members to protect their PII when it (1) failed to have security protocols and measures in place to protect that information; and (2) disclosed that information to unauthorized third parties.

112. As a direct and proximate result of T-Mobile's breach of implied contract, Plaintiffs and class members sustained actual losses and damages as described in detail above, including that they did not get the benefit of the bargain for which they paid and were overcharged by T-Mobile for its services.

## SIXTH CAUSE OF ACTION FOR VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17200, ET SEQ.

113. Plaintiffs incorporate each and every other allegation of this Complaint as though fully set forth herein.

114. As alleged herein, defendants and each of them have committed and continue to commit unlawful acts that violated and continue to violate Business &

Professions Code section 17200.

115.   As a result of the aforementioned acts, plaintiffs and the class member have lost and continue to lose money and suffer and continues to suffer in fact.

116.   Plaintiffs and the class members are entitled to restitution in the amounts unlawfully lost as a result of defendants' actions, with interest, injunctive relief, as well as an award of attorneys' fees and costs

**SEVENTH CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT – Cal. Civ. Code § 1750, et seq.**

117.   Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

118.   This cause of action is brought pursuant to the CLRA, Cal. Civ. Code § 1750, et seq. Plaintiffs and each member of the proposed Class are "consumers" as defined by Cal. Civ. Code § 1761(d).

119.   Defendants and each of them violated and continue to violate the CLRA as described above.

120.   Pursuant to § 1782(a) of the CLRA, on August 19, 2021 plaintiffs' counsel notified defendants and each of them in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that they rectify the problems associated with the actions detailed above and give notice to all affected consumers of defendants' intent to act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all Class Members, request judgment against the Defendants and that the Court grant the following:

1.     That the Court determine that Plaintiffs' claims are suitable for class treatment and certify the proposed Class;

2.     That the Court appoint Plaintiffs as representatives of the Classes;

3.     That Plaintiffs' counsel be appointed as counsel for the Classes;

4.     That the Court award compensatory damages, punitive damages, statutory and

civil penalties to Plaintiffs and the Classes as warranted by the CCPA, the CLRA and other applicable law;

5.     That the Court award injunctive or other equitable relief that directs Defendant

to provide Plaintiffs and the Classes with free credit monitoring and identity theft protection, and to implement reasonable security procedures and practices to protect customers' PII that conform to relevant federal and state guidelines and industry norms;

6.     That the Court award declaratory judgment in favor of Plaintiffs determining that Defendant's failure to implement reasonable security measures gives rise to a claim under the CCPA;

7.     That the Court award reasonable costs and expenses incurred in prosecuting this action, including attorneys' fees and expert fees pursuant to law, including, but not limited to, Cal. Code Civ. P. § 1021.5; and

8.     Such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for all of the claims so triable.

PLAINTIFFS' COMPLAIINT

DATED: September 20, 2021

Respectfully submitted,
SANFORD A. KASSEL
*A Professional Law Corporation*

/s/ Gavin P. Kassel
SANFORD A. KASSEL
GAVIN P. KASSEL
Attorneys for Plaintiffs

30

PLAINTIFFS' COMPLAIINT